Good morning and may it please the court, my name is Rachel Eda and I am a certified law student arguing on behalf of the petitioner Mudassar Asghar. I'd like to reserve three minutes for rebuttal please. This case is about an incompetently translated merits hearing that led to an improper adverse credibility finding that was not supported by substantial evidence in light of the totality of the circumstances. Mr. Asghar is a refugee who fled Pakistan after experiencing religious persecution including two violent beatings and repeated death threats because of his interfaith marriage to his wife Ms. Nadine. Mr. Asghar was compelled to leave Pakistan in order to keep his family together. This loving family including two U.S. citizen daughters is here with us in the courtroom today. Today I would like to focus my argument on two main points. First, the incompetent translation of Mr. Asghar's proceeding violated his due process rights and at a minimum made it impossible to reliably assess his credibility. Second, even putting aside the incompetent translation the BIA's adverse credibility finding was not supported by substantial evidence in light of the totality of the circumstances. First, remand is required because Mr. Asghar was incompetently translated merits hearing. Mr. Asghar's proceeding bore all types of evidence that tend to support a finding of incompetent translation under this court's precedent in Perez Lastor of the INS. This included three instances of incorrectly translated words, 45 times in which the interpreter requested repetition of a question, 12 clearly unresponsive answers by witnesses, and three instances in which a witness expressed difficulty understanding the proceeding and at a minimum made it impossible to reliably assess this credibility. In Perez Lastor, this court found that in adverse credibility cases the outcome of a petitioner's hearing is prejudice where there is evidence that the translation caused the BIA to disbelieve the petitioner's testimony. Here the translation caused the BIA to disbelieve witness testimony in Mr. Asghar's case in at least three instances. Can I ask you the first example in your opening brief is the question about how is it possible to get around without being able to read Russian, sir? This was when Mr. Asghar was in Russia and I believe what, 2013, 2014? Yes. And you say that, well, his answer was he was scared and that means the translation was inadequate. But if you look further, this is the rest of the testimony. The question is, what do you mean by scared, sir? Answer, because I was very good at cutting meat. Question, sir, I think you misunderstood. While we were living in Russia, how were you able to ride the subway or ride the bus or read a street sign without knowing how to read Russian? How were you able to get around? Answer, initially that was not possible at all. But as time passed by, I learned and started understanding things. Question, are you saying that you were able to read Russian as time passed by? Answer, no, I did not learn how to read Russian. I don't know that even today. So I guess in this instance, which was the first instance in your opening brief, my impression was that even though his initial answer was scared, he does then explain that he was able to learn enough Russian, at least to get around in Russia during the months that he lived there in those two years. So why don't you explain to me why, even with that additional language, that this is an inadequate translation? Yes. So I believe the initial unresponsive answer is a red flag that the translation was potentially incompetent and that there was a difficulty, Mr. Azar was having difficulty communicating with the translator. But if it gets clarified or corrected, is that irrelevant? Or don't we have to look at the whole transcript to see, was he provided a full and fair hearing? So I don't know, is it enough to say, well, I found one error here. And on that basis, I'm going to say the entire hearing was not full and fair. Yes. So you can't look at an isolated question and answer without looking at the full transcript. So if we find that the errors that occurred here, the vast majority were corrected or were clarified. I mean, this was your first example in your opening brief. I feel like this was clarified. So then do we still find a due process violation? Yes, you would still find the due process violation. And I want to point you to the three instances that directly related to the adverse credibility finding. For example, in reporting his police attack, Mr. Azar was asked, were you unaware you could report this attack? And he said, what I didn't have no idea that police is going to be able to help us because nobody was helping us. This was translated in a grammatically incorrect and potentially confusing manner. But rather than clarifying what Mr. Azar meant, the BIA and IJ instead interpreted that to mean he was unaware he could report his attack to the police, which was an unreasonable interpretation of the mistranslated testimony. So while the example you gave initially clarity was sought later on, this is an example of where clarity was never sought. The BIA instead decided to parse the language and arrive at an implausibility that, in fact, was not what Mr. Azar was saying. I'd also like to point this court to the case of Alunga v. Holder. This is a Fourth Circuit case that applied Ninth Circuit law set forth in Perez-Lastor and Hay v. Ashcroft. In that case, the Fourth Circuit found that evidence of an incompetent translation should inspire special caution before an IJ parses translated statements to assess inconsistencies. However, instead of taking special caution, the BIA, as I mentioned, instead parsed testimony that had significant evidence of incompetently translated words, unresponsive answers, and confusion by the witnesses. So you've pointed to three instances of documented, I think conceded by the government, mistranslation. Yes. Ten times when the interpreter asked to have the question repeated, and a number of other things that weren't directly mistranslation. I'm just wondering, what's your standard for how much difficulty in translation is needed to so infect a hearing that it becomes unfair? Yes. So Perez-Lastor addresses this question and finds that in the absence of a bilingual transcript, it's difficult to draw that line because we don't know exactly what the applicant was trying to say. So one instance, one instance is enough? In this case, I would say because these instances directly bore on the adverse credibility finding, one instance would be enough because the IJ and BIA are relying on incompetently translated prejudice and Perez-Lastor. I see the standard, the first standard they say is potentially affects the outcome of the proceeding. Second standard is a better translation would have made a difference in the outcome of the proceedings. Yes. And then Perez-Lastor also clarifies that in adverse credibility cases, the outcome can be prejudiced where there's evidence that the translation caused the BIA to disbelieve the petitioner's testimony. And in three instances, yes. And you cite the police and lack of knowledge that he could go to the police. What other incidents do you have? In addition to that, the BIA relied upon an inconsistency, an alleged inconsistency between Mr. Asghar's testimony and Ms. Nadeem's testimony over who told the neighbors that she was Shia. And in response, Ms. Nadeem was asked in her speaking poorly of her to the housemaid. And she stated, so she can answer that question, why did she talk bad about me? But she did not like me from then onwards. So she used to say bad things about me. That's an example of an unresponsive answer to the question posed. It did not clarify why it was significant. Her mother spoke poorly of her to the housemaid. And it also did not clarify who told neighbors that she was Shia. And yet the BIA interpreted that to mean it was the housemaid that told neighbors of her religion. But if you look at Ms. Nadeem's declaration, AR 977 paragraph 12, it says there was a commotion in our neighborhood that Mudassar had married a Shia woman. And this news spread like fire. The maid who worked in the house also worked for other households in the neighborhood. She told everyone about the reason of the commotion in our household. Yes, she did say that in her declaration, but she was never asked about that alleged inconsistency on cross-examination or by the IJ. And under SOTA Olarte v. Holder, the IJ was required to give her or Mr. Asghar a chance to clarify that alleged discrepancy. In addition to that, when she's saying, oh, my mother used to speak bad things to me to the housemaid, it could be both. But what is the impact? I'm sorry to interrupt you. What is the impact of the credibility finding as to Ms. Nadeem on Mr. Asghar's application if he's deemed not credible? Yes. So the IJ and BIA found that he was not credible also based upon Ms. Nadeem's testimony. So they kind of looped in her testimony with the reasons they found him not credible. However, if this court were to find that, or if they instead found Mr. Asghar's testimony was credible, Ms. Nadeem would essentially be a corroborating witness. And Mr. Asghar can meet his burden just by having his own credible testimony. So I'd like to turn now to some of the grounds upon which the BIA relied in finding Mr. Asghar not credible. I'd like to note that under... I guess let's go back to this, how the neighbors learned. Ms. Naskar's declaration is really explicit that it was the maid. And her testimony doesn't seem to me inconsistent with that. It says, ma'am, how did the neighbors find out that you or she had answers? So when all this happened, so there was noise in the home because a quarrel was going on. And this is how the neighbors came to know. And the woman who worked in our home, the maid, my mother-in-law used to talk to her bad things about me. Question, ma'am, can you explain why it is the significance that your mother-in-law said bad things to the maid about you? Answer so she can answer that question why she did talk bad things about me. So I don't know that's inherently inconsistent with her declaration. And Mr. Asghar was given the opportunity to explain this inconsistency and he said he didn't know. So I guess, why doesn't the record support the agency's finding as to that issue? Because Ms. Nadeem was never given... There was no follow-up question of Ms. Nadeem as to why she said it was the neighbor and why Mr. Asghar said it was the mother-in-law. And here where she submitted a declaration saying it was the maid. So I mean, it's paragraph 12 of her own declaration. The maid, she told everyone about the reason of commotion in our household, which was because Mudassar had married a Shia woman. Yes, that is true. Her declaration did state that. However, in her testimony, she's saying the mother-in-law spoke poorly to the housemaid and then the housemaid potentially told other people. So it could be true in some regard that it was Mr. Asghar's mother and the housemaid that spread this information to the neighbors. But we're there was no follow-up questioning of her as to that specific fact. I'd like to turn now to another inconsistency upon which the BIA relied. And that is that the difference between Mr. Asghar's CFI statement when he stated no, and then his subsequent testimony when he stated he met twice with the travel agent, once in May and once in June. And it allegedly called into question the motive of him leaving Pakistan. However, if you look at the timeline of his persecution, if he met with a travel agent in May, and then again in June, both of those meetings are related to his persecution. His initial meeting was with the travel agent after he had married Ms. Nadeem, after he was experiencing death threats. And then the subsequent meeting was after he was violently beaten two times. So trying to say that that calls into question his motive for leaving is incorrect. And second, Mr. Asghar was never given the opportunity to explain his response of no in his CFI. He was not asked that on cross-examination, direct examination, or by the IJ. And it is required that the court provide him an opportunity to explain under pseudo-alert. Let's look at that one. In his credible fear interview, Mr. Asghar stated that he had never considered leaving Pakistan before June 2019. But in the same interview, and throughout his hearing for the IJ, he indicated that he first spoke to a travel agent about leaving in May of 2019. So the agency is not required to accept Mr. Asghar's explanation, that the meeting with the travel agent in May was preliminary, he didn't decide to go and leave until June. Yes, so but the agency is required when they're to risk to explain the response of no. He was never confronted with his CFI statement. But he did give the explanation. He said my meeting with the travel agent in May was preliminary. And the reason I said that I didn't consider leaving until June is that's when I made the decision. So that was his explanation. It's just the agency is not required to accept that. So he did give that explanation as to how do you reconcile the fact that you met with a travel agent to leave in May, but you're saying you never considered leaving Pakistan before June. Yes. So he did provide that explanation when asked when he first met face to face with the travel agent. So he did provide that timeline. But it's also, it's unreasonable to impute that then the motive of his persecution or motive of leaving was called into question because regardless of whether he met in May or June, or both, those meetings were all related to his persecution. So characterizing it as material is also not correct. I see that I'm running low on time. You want to reserve some time? Yes, please. Okay. Two minutes, please. Thank you. So, Ms. Atuma. Yes, good morning, Your Honors. May it please the court. Anita Atuma on behalf of the respondent. This court should deny in part and dismiss in part the petition for three reasons. First, the record does not compel reversal of the agency's adverse credibility determination. Your Honors, at this point, there have been three levels of review as to Mr. Asghar's adverse credibility. First, before the asylum officer, who referred it to the immigration judge based on a lack of credibility. The second level of review was before the immigration judge. And the third was before the board who agreed with the immigration judge, all relying on the totality of circumstances under the real ID and listing specific encoded inconsistencies. And for the second reason, assuming jurisdiction, is even if there are any errors of poor translation, Mr. Asghar was able to present his entire claim. The third reason, again, is assuming jurisdiction, substantial evidence does support the agency's denial of asylum withholding in CAAT. And that's the finding that the agency made notwithstanding credibility. The court's determination and respond to some of the petitioner's arguments and questions. Judge Koh had asked petitioner, you know, whether one line of questioning during his hearing was enough to show that the hearing was unfair. And I believe if I understood her correctly, petitioner said yes. And I respectfully disagree, Your Honor. The standard is substantial prejudice. And this court in decisions like Chill, Bartolome, and Ramos have have explained that- I don't think that counsel, I don't think that's a standard. In Perez last year, the our court said when the BIA bases its denial of an asylum claim on an adverse credibility finding, as it did here, evidence that the translation caused the BIA to disbelieve the petitioner's testimony is sufficient to show prejudice. And if I may, Your Honor, petitioner lists three findings, the civil writ, who told the neighbors, and whether Ms. Nadeem's mother had knowledge of her being Shia. And as Judge Koh pointed out, if I could read or point to the record very specifically, either immediately after those questions, or shortly thereafter, petitioner was asked, re-asked the question, the question was rephrased or clarified. And in those circumstances, Mr. Asghar was able to answer. And even separately, notwithstanding, there's still adverse credibility findings, Your Honors, that haven't been infected or tainted with any of the allegations of poor translation or interpretation. For instance, the adverse credibility finding regarding the motive for his departure. This finding was based on Mr. Asghar's 589 application, where he said he faced persecution and beating due to change in his sect. And also in the civil writ, he said he was severely beaten due to change in his sect. And this is at page 916 of the record and page 1025 of the record. When he appeared before the immigration judge, Mr. Asghar was given the opportunity to explain, and this is at page 308 of the record, where DHS says, Sir, specifically, you said you changed your religious sect. Can you explain what you mean by changing your religious sect? Your Honor, this inconsistency is based on the 589 application, a paper application that was submitted. So there's no issue here about any interpreter, you know, infecting it. And at that point, Mr. Asghar says, well, at that point, what I meant to say was that everyone would think that I had changed or converted because of my marriage. And as Judge Cole pointed out, it's not enough. You know, the immigration judge or the agency isn't required or obligated. The immigration judge at page 71 of the record said that the statements in the 589 application was written and should have aligned with respondents' explanation for the inconsistency. And so even though petitioner may have meant one thing and said another, the agency was not required to accept it. The immigration judge found it was ambiguous or equivocal or misspeak, given offhand. Mr. Asghar's asylum application had been prepared with the assistance of counsel. He said he testified that it was prepared using an Urdu interpreter. That's at page 589 of the record. He attested in his 589 that it was to the best of his knowledge and truthful. And not only did Mr. Asghar give that information in his original 589 application, he said that same statement again in his amended 589 application, which was also prepared with the assistance of counsel. If Your Honors, I would point to Don versus Garland in support of this argument that even where in Don versus Garland, it was an applicant, a petitioner who was a Chinese, not a Chinese petitioner, and he was claiming religious persecution from China. And this court denied the petition for review, finding on two grounds that one, as to a beating when asked to explain, Mr. Asghar first said, I forgot. And then he said, well, I didn't forget what I meant to say. And then also regarding the omission of some injuries from his declaration, the immigration judge, or rather this court, found that certainly a reason, and I quote, a reasonable adjudicator could interpret Don's testimony as waffling between inconsistent reasons for why he hadn't sought medical care and inconsistent descriptions of how serious his injuries would be. But the standard of review was not to reweigh the evidence and was rather to substitute a judgment. And the standard is whether it would compel a reasonable adjudicator to find otherwise. So that goes to the motive, Your Honor. There's a second finding, which is also not infected by any translations, and that's the demeanor finding, Your Honor. Before the agency, Mr. Asghar was asked very specifically about a social media post that he had put on the internet while he was living in Russia. And during that questioning on found that his demeanor became combative. And it appeared that he was, you know, he would see a pair combative across examination. And Lalliane very specifically. Sorry, Your Honor. Or sorry, rather, Manis. Manis is this court's decision that addresses demeanor findings. And Manis says that when nonverbal communication may be a basis for a demeanor finding, if an immigration judge gives specific examples, or by making explicit reference to the record, and aspects of demeanor may include expressions of countenance, how petitioner seats or stands. And here, if you read the record, Your Honors, the questioning, the case in chief by the DHS attorney was that there was a document that showed or that was reporting that an individual by the name of Mudassar Asghar, the petitioner's same name, had been involved in some human trafficking to Russia. So the questioning around that line at that point was whether or not, and what was the basis for Mr. Asghar posting some conversations or pictures, I believe, that was trying to engage with women. And at that point in the hearing, Mr. Asghar got confrontational. And the immigration judge very specifically gives this in the immigration, sorry, gives him an opportunity to explain. And he says, across examination, that he meant to admit it, he had his opportunity to explain. And so that's a second adverse credibility finding that that's supported by substantial demeanor. A third one, Your Honor, that isn't infected by any translation errors is the plausibility of Mr. Asghar's statement that he had no knowledge of U.S. travel requirements. And this court has held that implausibility findings should be what the immigration judge in this case did. The immigration judge found, based on Mr. Asghar's testimony, that he had traveled to countries like Belarus, to Russia, to Colombia, both for reasons for business, for pleasure. The record showed that Mr. Asghar, he was questioned if he needed a visa for traveling to Colombia, he indicated yes or no. So based on his knowledge of travel and his knowledge that there were some visa requirements for certain countries, the immigration judge found that it was implausible. At page 407, he was given the opportunity to explain. The immigration judge says, do you have an explanation that you did not know there was a place to enter lawfully into a country? And at 407, Mr. Asghar gives his explanation, which petitioner is twisting, but his response was basically his lack of education, the that he did not know that there were travel requirements. And the immigration judge rejected it, finding that they were unpersuasive. The board of immigration judge- Let me ask you a question. In your opposition brief, pages 55 through 56, you basically state that to set forth a due process claim, an applicant would have to articulate alternate testimony he meant to provide to the IJ, and how that evidence would have affected the outcome of his proceedings, if at all. So are you saying that basically we'd have to have an entire hearing before an appellate court, because there would be conflicting and alternate testimony provided? Is that really what the government would want? No, Your Honor. And I apologize, that was inarticulately argued in our brief. But the we're making really is that at all times during the case, Mr. Asghar had the full and fair opportunity to ask an answer, to present his evidence and to answer questions. So even where it may have seemed initially that he didn't understand or didn't comprehend, once the questions were rephrased, once they were clarified, Mr. Asghar was able to present his claim in full. There's nothing that Mr. Asghar- Counsel, I take it that the government is basing its position on the lack of prejudice, prom. Not that there wasn't evidence of mistranslation. Yes, Your Honor. Whatever evidence there was, it didn't rise to the level of prejudicing under the correct standard in Perez last door. Yes, Your Honor. And so that I agree that when you look at- I'm sorry, I'm sorry to interrupt. Are you challenging that any of the inaccuracies were corrected or clarified? Or you're saying no, all of the inaccuracies that have been pointed out are in fact inaccuracies or inadequacies? I'm arguing that there are some inaccuracies. I believe, Your Honor, that all the inaccuracies were clarified or Mr. Asghar had an opportunity to clarify or to respond and understood the questions asked. But also when it comes to the inaccuracies or the alleged inaccuracies that have a bearing, a bearing on the adverse credibility determination, those very specifically, either he definitely had an opportunity to expound or clarify or answer questions. And that further than that, Your Honor, there are adverse credibility findings that are not infected at all by any interpretation or any translation errors. And so even if the court disagrees and finds that there were translation errors or inaccuracies that weren't, and I can list a couple. I know Your Honor had mentioned the one about being in Russia and how he was able to get around. Again, that had no bearing on it. And he was given, as the record showed, and Your Honor pointed out, he was given the opportunity. In all those circumstances, and I believe I pointed them out in my brief, but in all of them, either directly or immediately after, the immigration judge either interjected, because there was one point when the interpreter himself started. What if we find that translation errors to the petitioner's wife were significant enough to impact the credibility determination against her, the adverse credibility determination against her? Then what do we do? How does that impact the petitioner's case? Well, if the petitioner's, if, sorry, if Ms. Nadim is found not credible and Mr. Asghar is also found not credible, or if Ms. Nadim is found not credible and Mr. Asghar is found credible? Well, if we find that the translation errors were significant enough as to the petitioner's wife, Ms. Nadim, to have impacted the adverse credibility determination made against her, then do we still find no due process violation in that instance or not? And I guess you might say it depends on whether Mr. Asghar is deemed credible or not. That would be my initial response, Your Honor. That would depend on Mr. Asghar's, corroborating his, but I would also say that standing alone, her, any inaccuracies in her, she also had an opportunity. If I may, I know I'm running out of time, but I did want to say that to Judge Coles, it's that question on that. Petitioner had, or sorry, Ms. Nadim had an opportunity and chose through counsel to rely on her declaration. Then when she was at her this wasn't a situation where the immigration judge or DHS snuck up on anyone and said, gotcha. They agreed that Ms. Nadim would start on cross-examination. And on cross-examination, Ms. Nadim had opportunities to explain any inconsistencies that had been pointed out. So the one inconsistency Your Honor had asked about with Ms. Cole, sorry, with Ms. Nadim, where petitioner had argued that she didn't get an opportunity. I would, I have the record site where she did where the DHS attorney very specifically stops her and gives her an opportunity to respond. But also I would say that petitioner shouldn't be able to stand behind, um, you know, through the doctrine of uninvited, invited error. Petitioner shouldn't be able to say, oh, I'm going to rely on this declaration. And then later on turn around and argue that they never had an opportunity to explain when, when she did. Ms. Otunla, I'm sorry. I'd like you to go back to a question that Judge Cole asked. I'm not sure you precisely answered. Okay. Suppose we conclude that Nadim's credibility finding was infected by translation errors. What does that mean for the credibility finding against her husband, who is the petitioner in this case? Yes, Your Honor. I agree. I did not understand the question. Again, it would be the same substantial prejudice, um, argument that we made in our brief and that I've been making today in that, um, if petitioner can show that again, those findings, um, if she had an opportunity to explain, or if they were relied on by the agency, then, um, if petitioner, petitioner needs to show substantial prejudice in order for them to apply to Mr. Asghar's credibility. It's not substantial prejudice. So, Your Honor, I defer to... But I understand what you're saying. You're saying you still have to show there would have been a difference in the outcome with alternative testimony. Yes. And the, the citation I wanted to mention as regards to Ms. Nadim and who told the neighbors, um, it's in the record at page 389 to 390, where the, um, Mr. Asghar was given the opportunity, he was asked to explain that inconsistency. He, like Judge Koh said, he said, I don't know. And then when Ms. Nadim, um, took the stand for cross-examination at page 463, she was given the opportunity to explain that. So I think Judge Koh, did you have one more question? Yeah, I was just unclear on your point about relying on the declaration. So you're saying there was no direct, there was only a cross. Right, because... Is that your point? Well, yes, Your Honor. So the point was that the declaration was her direct, for all intents and purposes, that was her direct. And so the cross-examination, that would have been the opportunity and the chance to explain and, um, petitioners arguing that she didn't have an opportunity. Was there no redirect? Was there no redirect? There was a redirect, Your Honor. There absolutely was. And I can give you that, um, at page 474 to 83, that was Ms. Nadim's opportunity for, or that was her redirect. All right. Counsel, you're four minutes over. So thank you very much. Thank you, Your Honor. And so I would ask that you deny the petition for review. Thank you. I'd like to start by even putting aside the incompetent translation, noting that the BIA's adverse credibility finding was not supported by substantial evidence in light of the totality of the circumstances. Respondent, um, pointed to a specific inconsistency as to whether or not Mr. Asghar changed his religious sect. Um, and I want to point out that in arriving at the conclusion that Mr. Asghar was inconsistent as to what his religion was, the BIA and IJ parsed Mr. Asghar's asylum statement, removing one line, taking it out of context. Mr. Asghar's full asylum application statement reads, due to my wife's religion as she is Shia and I am Sunni, we get a lot of threats from the Sunni Muslim community. We have faced persecution and beating due to changing our sect from Sunni and Shia to Ali Tashi. Sunni Muslims think we are Mutaad, i.e. left the faith, and we have been threatened on account of my wife's religion. So it's notable that in parsing that statement, the BIA removed important context, notably that Mr. Asghar was clear that he is still Sunni and his wife is Shia, and that it was his marriage to Ms. Nadim, a Shia woman, that prompted his persecution. But the quote in the I-589 form faced persecution due to changing our sect, not her sect, not my wife's sect. It did say our. I'd like to note that Mr. Asghar is not English-speaking, so that part was potentially confusing, but taking it in context. And he also noted that he liked his wife's religion better. I don't believe noting that you like your wife's religion better means that you converted religions. He can like his wife's religion better and not convert to her religion. I don't think there's a genuine question that Mr. Asghar is not Sunni. He stated numerous times during his CFI, during his cross-and-director examination, that he is Sunni and his wife is Shia, and it was that marriage that prompted his persecution. So finding otherwise would go against substantial evidence and the testimony of Mr. Asghar. I'd also like to note the demeanor finding in which respondent brought up. And I would like to emphasize that this instance of his allegedly combative demeanor occurred in one instance on cross-examination when he was being asked personally embarrassing questions about his social media history. The government admits in their briefing that this was a trivial line of questioning unrelated to Mr. Asghar's persecution. Also notable, under Kumar, this court found that where only one inconsistency remained and a demeanor finding, that was not enough on its own to support the adverse credibility finding and remand was required. So similarly, in this case, even if your honors do not find that all of the grounds upon which the BIA relied should be overturned, if you find that several or many of them should be overturned, remand is required. Thank you. All right. Thank you very much, counsel. Thank you, Ms. Eidman, for supervising. And thank you to UC Irvine. Both counsels did an excellent job today. So this case will be submitted. We've already submitted Morales v. Garland. So this session of the court is adjourned for today. Thank you. All rise. This court for this session stands adjourned.
judges: WARDLAW, KOH, UNKNOWN